FREDERICK HALL v. CITY OF IONIA AND JAMES McEWAN.

*Ownership of water is an interest in realty—Injunction to restrain its diversion.*

Reservations in a deed are to be construed as having the force which the deed evidently meant they should have.

The ownership of water cannot be confined to a mere right in the nature of a license, and is not dependent on lands to which it may be appurtenant; it is as well recognized a title or interest in realty as land itself, and uses by which it is limited to special places and specified purposes are exceptional.

When land is conveyed with a reservation of the right to divert a stream so that it shall flow out of the premises, and the use of the water is afterwards granted to subsequent grantees of property on the borders of the stream, to be used in the due enjoyment of the property but to be returned to the channel above the point of diversion, neither they nor their successors can collect the water for any purposes aside from those connected with their riparian rights above that point.

Injunction lies to restrain the collection and diversion of the water of a stream by an upper riparian owner limited to its use for certain purposes and required to return it to its channel.

Appeal from Ionia. Submitted Jan. 23. Decided April 3.

INJUNCTION. Bill dismissed. Complainant appeals.

*Alex. W. Dodge* and *A. F. Bell* for complainant. If an owner of land diverts the course of a stream flowing through it, subsequent grantees of parcels of the land obtain no right to the flow of the stream in the old channel, *Roberts v. Roberts*, 55 N. Y., 275; 10 Alb. L. J., 76; and injunction will lie to protect the right of the owner of the water from infringement, Bispham's Equity, 394, §§ 437–464; Kerr on Injunctions, 570; High on Injunctions, 761; *Webb v. Portland Mfg. Co.*, 3 Sumn., 189.

*Bennett & Soule* and *A. B. Morse* for the defendant city of Ionia.

CAMPBELL, C. J. The bill in this cause was filed by

Hall as owner of a water right, against the defendants to restrain them from diverting the water, which they were preparing to do for the purpose of a corporation supply for such uses as cities generally have occasion for.

The little stream out of which the controversy arises, has its source in a small springy tract in the southeast corner of section 18 and northeast corner of section 19, in township 7 north, of range 6 west; and, running down a short distance southwardly, was then turned westward by a dam and elbow, so as to conduct it across section 19 to another similar stream still smaller, whose combined waters were formerly used to run a mill, and after passing that flowed by a short passage into Grand River. The stream in controversy, called East Creek, is a very small but rapid run about a yard wide, and deep enough to make in some places a cross section of about 96 inches. The testimony shows it would not usually quite fill a ten-inch pipe. Its capacity for driving machinery made it equivalent for driving the wheel actually used, to about eight horse power. Its money value is shown to be from $3,000 to $5,000.

Section 19 was purchased of the United States in 1833 by Samuel Dexter. On February 3, 1836, Samuel Dexter and wife conveyed to their son Lorenzo Dexter a parcel from the northeast part of the section containing sixty-eight 30-100 acres, through which the water flowed. The deed was made with the following qualification: "The parties of the first part reserve the right of turning the waters from the land in the stream running near the west line of said land forever; also the right of making repairs on the works for turning said stream wherever it may be necessary."

On the 9th of February, 1837, Samuel Dexter and wife conveyed to their daughter Mary A. Tibbits twenty acres adjoining Lorenzo Dexter's land, through which the stream in its natural channel flowed to Grand River; and that deed contained the following clause: "Always reserving to the parties of the first part the right of

constructing a canal across the same land whenever and wherever they choose. And also always reserving to the said parties of the first part the right of diverting the waters of the East Creek so-called, which now runs through said land, from its natural channel to the grist mill of the said Samuel Dexter, through the medium of a canal, with the appurtenances, and all the estate, right, title and interest therein of the parties of the first part."

Samuel Dexter commenced a ditch from a turn out elbow and dam and ran it across westward till it was joined as before mentioned with the water from West Creek and thence to his mill, in 1837 and 1838. On the 17th of April, 1837, Robert S. Parks and Lawson S. Warner, who had purchased from Lorenzo Dexter, and who desired to use the water for their business, took from Samuel Dexter a grant of his right "of, in and to all the water of the East Creek so called, running through section nineteen, town seven north and range six west, with all and singular the hereditaments and appurtenances thereunto belonging, excepting at a point below the shop built and now occupied by S. B. Worden, a distance from said shop 2 chains and 3 links according to the meanderings of said creek, and 1 chain and 86 links in a straight line, where I have now commenced the digging of my race, and where I do forever hold the right of turning the waters of said creek at said point."

Parks testifies that according to their understanding in getting this grant, and their action under it, the water was to be returned by them into the stream so as all to pass through the canal or ditch referred to. They built a woolen factory, and they and subsequent grantees from time to time built and renewed their dams and used the water as they needed it, not diverting it from its natural way to reach the ditch. The property above the ditch has now passed into the hands of the city of Ionia, who purchased July 26, 1875, of one Clark, and who when this bill was filed about two months there-

after were making arrangements whereby all or substantially all the water would be drawn off by pipes from their premises where they were preparing to keep it stored, so as to cut off the further course of the stream below them.

On the 19th of April, 1847, Samuel Dexter and wife conveyed all their interest in section nineteen to John C. Dexter. He had previously in 1837 built a mill and used the water power to run it. This use was continued by John C. Dexter with his father until 1852 and thereafter until 1861, when he substituted steam.

About 1866 John C. Dexter entered into a contract with the village of Ionia, whereby they were to be at liberty to take water from the ditch for five years to use for cisterns and fire purposes, and in return were to put in a new conductor or flume in the ditch and keep it covered and maintain it during that period,—after which it was to belong to John C. Dexter, or his assigns. The village went on and acted under this contract.

October 15, 1868, John C. Dexter and wife made a conveyance to complainant, in consideration of the price of $3,000, which he paid therefor, of all the water rights in East and West creeks and the ditch and appurtenant rights as follows:

"All the right, title, interest and privileges which the parties of the first part have in and to the waters of the East and West creeks, so called, on section nineteen, in town seven north, of range six west, in Ionia county, Michigan, being the creeks formerly used by the said Dexter in propelling his grist mill in the village of Ionia, together with the right of conveying the said waters in races or ditches from said creeks in the races or ditches which have been heretofore used by the said Dexter, also the right to maintain and keep in repair said races or ditches, and to enter upon the land adjoining said ditches for repairing said races or ditches; it being the intention of the party of the first part to convey all the rights which the party of the first part has in the waters of said streams, and the right to carry said waters in the ditch or race heretofore used by said Dexter, always excepting and reserving from this conveyance a right granted to Abel Avery, and his grantees

to convey water from said race to the lots on which the Eagle hotel in Ionia stands; also excepting and reserving the rights which the village of Ionia has in the use of the water from said race for the use of the fire department in said village, which right will expire in the spring of the year 1871. But it is understood that the rights now belonging to said village of Ionia, when the same shall expire shall belong to the said party of the second part."

The corporation was allowed to use the water by Mr. Hall for some time after the first grant expired in 1871. Thereafter various negotiations were had for the purchase of the waters of East and West creeks, but there was some difference of opinion among the city authorities, and a proposition from them to complainant to accept the liability of a railroad company to which they proposed to furnish water for $500 a year was not deemed satisfactory and not accepted. The price demanded for East creek was $3,000, and for both creeks $5,000, with a quit-claim deed, or a larger sum with warranty. The principal difficulty seems to have been about the form of the deed and the terms of payment. The city had made partial arrangements to sell water to two railroads,—the Detroit, Lansing & Lake Michigan road for $500 a year, and the Detroit and Milwaukee for $100, which would have given the city water for its own purposes at a very small cost, if not free. The committee appointed to deal with complainant and his associate, Mr. Townsend, who was interested in West creek, seem to have taken a sudden idea of purchasing the woolen factory property before mentioned above the ditch, and appropriating the water by means of a dam and-reservoir there, and preventing the stream from flowing farther,—and so avoiding making any payment for Hall's rights; and instead of reporting on the Hall and Townsend proposition referred to them, they recommended the purchase of the woolen mill, which was done.

They now defend this suit on the ground that their riparian rights in the woolen factory property give them

power to monopolize the stream.    They further claim
that Hall took no rights which he can enforce to any
of the water of East creek.   Some minor questions were
also raised, which, so far as material, may be noticed in
their place.

Upon a careful inspection of the record, we think
there is very little room for controversy.  It is manifest
from the conveyances of Samuel Dexter, that if it is
legally possible for him to secure and retain for himself
the right to the water and the right to divert it into an
artificial channel, he has done so.   It is not at all
important to find any technical name for his method,
or to spend time in the legal etymology of exceptions
and reservations, which terms have been used with some
carelessness and confusion.   The general and as we think
the correct method of construing such provisions as those
in question, is to give them the force which the deeds
evidently intended they should have; and we can have
no doubt what intention is manifested by the terms of
these instruments.

There is no foundation for the claim that a right to
the perpetual use of water must be dependent on a par-
ticular estate with which it is connected.   Some confu-
sion has perhaps been caused by an attempt among
writers to create symmetry in the law by putting all
rights connected with lands or springing from them into
classes; and by speaking of these particular rights as
easements, which very commonly require both a dominant
and a servient estate.   But every right of property must
usually have some peculiar qualities of its own, which
must not be destroyed by inappropriate attempts to
classify it with different kinds.    The old maxim *Omnis
definitio periculosa* is especially true when things of essen-
tially different qualities are placed together under one
head.

The value of water as a distinct inheritance, either
for creating power or for other purposes of use or con-

sumption, has been recognized in all periods, and its ownership is well established as not dependent on lands to which it may be appurtenant, but as having a separate and intrinsic importance. There may be an occasional *dictum*, and possibly some decisions to the contrary; but most cases where any doubt seems raised on this question will be found to rest on peculiar facts which in no way involved the general doctrine. The facts are often such as to confine the use of water not only.to special places, but also to specified purposes. But this limited use is the exception and not the rule. *Hathaway v. Mitchell*, 34 Mich., 164. And for the general doctrine see, among many cases, *Hurd v. Curtis*, 7 Metc., 94; *Pettee v. Hawes*, 13 Pick., 323; *Cary v. Daniels*, 5 Metc., 236; *Borst v. Empie*, 1 Seld., 33; *Goodrich v. Burbank*, 12 Allen, 459; *Owen v. Field*, 102 Mass., 90; *Emerson v. Mooney*, 50 N. H., 315.

Experience has shown that in many instances the right to use and dispose of water may not only be more valuable than any land which is occupied for its gathering and disposal, but it is also of special value to be taken to a distance and parceled out among several users or occupants. Water-works are only made available by the sale of water to consumers, and valuable water power is frequently distributed among several mills in large and small quantities, and may not be used by the owner at all. The ownership of it cannot be confined to a right in the nature of a. license, and is as well recognized a title or interest of a real nature as land itself, without some use of which it could not be made available. The title of Mr. Hall. is fully made out to the water in question, except so far as appurtenant to the upper owners now represented by the city.

The city of Ionia has succeeded to the interests of Parks and Warner. These were confined to such uses as were made in connection with their riparian property above the place of diversion. They had no right to collect the water for any other purpose. *Swindon Water*

*Works Co. v. Wilts & Berks Canal Navigation Co.*, L. R., 7 H. L., 697; *Dumont v. Kellogg*, 29 Mich., 420.

It is claimed that some of the water has been taken into the stream since the reservation, and formed no part of it. If defendants had gathered this additional water themselves for the purpose of supplying their water pipes from sources which would not have sent water into the stream, a very different question would arise from what is now presented. It appears plainly that this additional supply is not only trifling in amount, but was not turned into the stream for any purpose of enlarging it. It is simply the improvement of the natural drainage made to accommodate neighboring lands, and quite independent of the purposes of either of these parties. It cannot, therefore, be considered.

It is much to be regretted that the city authorities did not find it convenient to complete their arrangements in some way to secure a permanent title to the water which they had before recognized as belonging to complainant, and enjoyed by his permission. They have been mistaken in supposing that as upper riparian owners they could absorb the stream for city purposes.

We think the complainant has a right to an injunction against the threatened proceedings of defendants to collect and divert the water to purposes foreign to their use and enjoyment of the woolen factory premises, and that the prayer of the bill to that effect should have been granted.

The decree must be reversed with costs of both courts and a new decree entered accordingly.

The other Justices concurred.