## SARAH NICHOLS ET AL. v. THE NEW ENGLAND FURNITURE COMPANY.

*Deed—Description— Plat — Acceptance of street — Boundaries of lot—Fee of canal bed—Estoppel—Adverse possession.*

1. When a general description of real estate is given, followed by a more particular description, the latter expresses the intent, and controls; citing *Smith v. Strong*, 14 Pick. 128; *Whiting v. Dewey*, 15 Id. 428; *Winn v. Cabot*, 18 Id. 553; *Dana v. Bank*, 10 Metc. 250; *Howell v. Saule*, 5 Mason, 410; *Barney v. Miller*, 18 Iowa, 466; *Jones v. Smith*, 73 N. Y. 205; *Gano v. Aldridge*, 27 Ind. 294; *McEowen v. Lewis*, 26 N. J. Law, 451.

2. When reference is made to a map or plat in a deed, such map or plat is considered as incorporated in it as fully and completely as if it were actually delineated in the instrument; citing *Wilson v. Hoffman*, 70 Mich. 552; *Heffelman v. Water-Power Co.*, 78 Id. 121; *Jefferis v. Land Co.*, 134 U. S. 178; *Miller v. Land Co.*, 44 Kan. 354.

3. Though a plat be not signed and acknowledged, so as to effect a statutory dedication of a street marked thereon, yet, the intent being clear, acceptance is implied from user, and improvements paid for by assessments on the land of abutting owners.

4. One cannot have the benefit of the adverse possession of land by his predecessors in title where the conveyances under which he claims do not purport to convey the premises so occupied, and where the same are not within the inclosure of those actually conveyed.

5. Upon the facts of this case, as stated in the opinion, it is held that it was the intention of the original proprietors of the land of which the premises in dispute form a part, who platted the same, built a dam across the adjacent river, and constructed the canal upon which said premises abut, to reserve the title to the bed and banks of the canal, the strips of land marked on the plat as "reserved," the basin, and chutes as and for their private property, and that in the conveyances of adjoining mill lots they conveyed the fee in the lots as platted only, and that the grant of the right to use the water from the canal in connection with said lots was of an easement simply,—a right to the flow of water through

flumes constructed for that purpose. An examination of the opin·on is essential to an intelligent understanding of the questions decided.

Error to Kent. (Adsit, J.) Argued March 7, 1894. Decided May 18, 1894.

Ejectment. Defendant brings error. Affirmed. The facts are stated in the opinion.

*Uhl & Crane* (*Fletcher & Wanty*, of counsel), for appellant.

*Bundy & Travis* (*J. W. Champlin*, of counsel), for plaintiffs.

McGRATH, C. J. Plaintiffs, the widow and children of Isaac H. Nichols, bring ejectment to recover the premises lying between the north line of lot F, extended, the south line of lot G, extended, the center line of the canal, and the east line of Mill street, as shown on the sketch on next page; the defendant having constructed a building on piles over the canal on said premises.

Defendant claims title to the premises in question from two sources: (1) That, by conveyance of lots F and G according to the plat, it has the title in fee to Mill street, and to the center of the canal, as part and parcel of lots. F and G; and (2) by adverse possession.

Prior to 1836, the owners of certain land abutting on Grand river commenced the construction of a dam across said river, and a canal along and upon the eastern shore thereof. In 1836 the proprietors of the land and canal made and recorded a plat of the same. The plat shows the location of the canal, dam, guard gates, chute, basin, thread of the river, and the subdivision of the adjacent land into lots, with streets and alleys. A large section of the territory platted lies east of Canal street, and from near-

Bridge street Canal street runs along the east bank of the canal to a point north of the dam.    The canal is 81 feet in width, and Mill street is 25 feet wide.    There appear upon the plat, under the head of "Explanations," these words:

"A strip of ground 8 feet wide, lying on the east bank of the canal, and extending from the guard gates to the corner of lot No. 1, is reserved as private property; also ·8 feet in front of the basin; also 6 feet on the east side of the canal, in front of Bank street, is reserved as private property; also 5 feet on the west bank of the canal, in front of Mill street, is reserved."

The title of the land at the time the plat was recorded was in Lucius Lyon and Nehemiah O. Sargeant, each owning an undivided half.    Sargeant, in July, 1836, conveyed his undivided half to Carroll, and in October, 1844, Carroll reconveyed to Rice, administrator of the estate of Sargeant. Rice conveyed to Lucretia Lyon, who conveyed to Daniel Ball.    Lucius Lyon conveyed his interest to Thayer, and Thayer to Daniel Ball.    Plaintiffs derive their title through conveyances from Ball.    The deed from Sargeant to Carroll contains in the description not only the lands described by government subdivision, but adds: "Together with all the improvements, mills, and mill races, canals, water lots, and water power appertaining to and belonging to said premises."    It also contains a reservation of a third interest in mill lots A, B, and C, as the same are designated on such plat, "together with the quantity of water specified and defined for the use of said mill lots in the conveyance to John P. Calder, reference being thereto had."    The deed from Rice to Lucretia Lyon conveys the canal, water power, and undivided half of the basin.    The deed from Lucretia Lyon to Ball conveys "all the right, title, and interest in and to those certain premises known as the canal, water power, and appurtenances, including the land between the basin and Canal street, and

the use of the basin, situated in the village, now city, of
Grand Rapids, Kent county, and State of Michigan, accord-
ing to the recorded plat thereof, subject to all rights here-
tofore made." Lucius Lyon conveys to Thayer "all the
lands, tenements, premises, water privileges, and appurte-
nances which the said party of the first part owns and holds,
either in severalty or otherwise, within the corporate limits
of the village of Grand Rapids, in the county of Kent, and
State of Michigan, as aforesaid." Thayer conveys to Ball
all the interest conveyed by Lyon to Thayer.

Daniel Ball, on February 29, 1864, by separate deeds,
conveyed to each of the following named parties parcels of
land in said plat, and also the undivided interest in the
water power, bed, and banks of the canal indicated by the
figures following the name of such grantee: S. F. Perkins,
1875–8000; C. C. Comstock, 1500–8000; G. S. Deane, 375–
8000; Isaac H. Nichols, 1650–8000; Martin L. Sweet, 1375–
8000; and R. E. Butterworth, 1225–8000. The denominator
8000 represents the total value in dollars of the bed and
banks of the canal and strips of land on either side, as
agreed upon by the parties, and the numerator the value
of the undivided interest of each purchaser. The con-
sideration recited in the deed to R. E. Butterworth was
$1,225, and the property was described as follows:

"All of mill lot L, so called, according to the Kent
plat of the village, now city, of Grand Rapids, lying north
of and adjoining the premises owned and occupied by the
said Butterworth, being about 92 feet; also the undivided
half of lot K, according to said Kent plat; also all riparian
rights in and to the bed of Grand river west of said lot
L, to the center of Grand river, and the undivided half
of all riparian rights in and to the bed of Grand river
west of said premises described as lot K; *also the right to
draw from said canal sufficient water to propel two runs of
mill stones with the necessary gearing attached, used in an
economical manner;* also the 1225–8000 of all said parties
of the first part's right, title, and interest of, in, and to

the canal bed, canal, canal banks, water power, water rights, privileges, and appurtenances in said city, extending from the south end of the canal basin to a point 50 feet north of the guard gates as now located, and to the guard gates and waste way; also the same interest of said parties of the first part in and to the basin and banks thereof, excepting and reserving the vacated portion of said basin, and the right to use the west bank of said vacated basin for a highway; also the same undivided interest of said parties of the first part of, in, and to a strip of land 8 feet wide, more or less, lying between the east bank of the canal and Canal street, extending from the north-east corner of lot 1, Kent plat, to a point 50 feet north of the guard gates as now located, and to a strip of land 6 feet wide, more or less, on the east side of the canal between Bank street and the canal, and to a strip of land 5 feet in width, more or less, on the west bank of the canal in front of Mill street, and in all lots, lands, and premises west of the canal to the center of the river between the said line 50 feet north of the guard gates to the south bank or end of the canal basin, together with all water rights, water power, and appurtenances thereto attached and belonging, not this day conveyed to R. E. Butterworth, I. H. Nichols, Samuel F. Perkins, Martin L. Sweet, Gaius S. Deane, and C. C. Comstock, together with all the rights to enter upon the canal banks, bed, and dam above said guard gates to repair and improve the same."

Four of the other deeds executed by Daniel Ball as aforesaid convey water lots or mill lots, and each of them contains a similar clause granting the right to draw water from the canal for the water-lot use. Each of said Ball deeds contains a grant of an undivided interest in canal bed and banks, in language similar to that quoted from the deed to Butterworth.

We are cited by defendant to a conveyance made in 1836 by Lyon and Sargeant to Calder of an undivided one-third of mill lots A, B, and C, wherein such lots are described as:

"Known and distinguished on a map or plan of the village of Kent, made for the proprietors thereof, as 'Mill

Lots A, B, and C,' lying between the west bank of the canal and the river, the boundaries whereof are described as follows: Beginning at a point on the front side of the west bank of the canal where the north line of Bridge street intersects the same; thence measuring along the bank of said canal northerly 239½ feet to an angle in the bank; thence continuing a distance of 60½ feet to the north-east corner of lot A; thence,'" etc.

It will be observed that the north-east corner of lot A lies at the intersection of the north line of lot A and the west line of the 5-foot strip which is designated as the bank of the canal. Note also that lots A, B, and C were platted from points on the west line of this strip, and none of the lot lines extend across it. The north line of Bridge street on the plat is extended to Grand river, and forms the north line of Mill street. Lot D is platted within the lines of Bridge street, but fronting on Mill street. The north line of Bridge street intersects the east line of lot C at the west side of the strip, so that evidently the words, "the front side of the west bank of the canal," refer to the west line of this strip called the bank of the canal. Proceeding northerly on the west line of this strip or bank of the canal brings us to the north-east corner of lot A, in the description of the deed, and makes the whole harmonious. It was not intended by this deed that the grantee's right or title should extend to the center of the canal, for in the same deed it is stated that "said lots above described are to be held in common by the party of the second part with the parties of the first part, subject to the following conditions, restrictions, reservations, and privileges, which are hereinafter mentioned and defined; that is to say: *First.* The privilege and right to draw from the canal 20 feet of water, which is the quantity appropriated for the use of said lots A, B, and C, for hydraulic purposes," etc. "And also said parties of the first part except and reserve for themselves, their heirs and assigns,

forever, the right of way over, through, and across the before-mentioned lots A, B, and C; that is to say, a space 25 feet wide on the west bank of the canal, commencing at the north line of Bridge street, and running northerly along the bank of the canal across the aforesaid lots A, B, and C, being a continuation of a street designated on the map before referred to as 'Mill street,' the same to be kept open and used in common by the parties of the first part and second part, and also for the convenience of the parties of the first part, their heirs and assigns, servants and agents, in passing to and from their premises lying above the said lots A, B, and C." It will also be seen that the extension of Mill street northerly continues it along the west line of the strip.    When Sargeant conveyed to Carroll, in July, 1836, he excepted the undivided third of mill lots A, B, and C, conveyed to Calder, "as the same ·are designated on said village plat."

A deed from Ball to one Caswell, dated in 1853, is also referred to, which describes the land conveyed as "all of Mill lot E, and so much of Mill lot F, next adjoining, in addition to said mill lot E, as shall be required to make the premises hereby conveyed 100 feet wide on a line running north and south across the said premises, the same extending on the west to Grand river, and on the east to the canal, and the north and south boundary lines thereof being parallel to each other; *reference being had to the village plat of Kent,* recorded,    *    *    *    *for a more particular description of said lots E and F."    This deed specifically grants the right to draw water from the canal, sufficient, etc.

Another deed is referred to, dated in 1873, of a portion of lot E, which describes the parcel as "30 feet front and rear off the north side of mill lot E, being all of said lot north of a line drawn parallel to the north line of said mill lot E, and 30 feet from and south of said north line,

and extending across said lot from the canal on the east to Grand river on the west; reference being had to the Kent plat, so called." The same deed afterwards describes the premises immediately south of the last description as "commencing at the west line of Mill street, Kent plat, in said city, 30 feet south of the north line of mill lot E; thence westerly, parallel with the north line of said mill lot E, to Grand river; thence south 25 feet; thence easterly, parallel with the north line of said mill lot E, to Mill street; thence northerly, on the west line of said Mill street, to the place of beginning." Each description is followed by a grant of the right to draw water from the canal.

It is well settled that when a general description of real estate is given, followed by a more particular description, the latter expresses the intent, and controls. *Smith v. Strong*, 14 Pick. 128; *Whiting v. Dewey*, 15 Id. 428; *Winn v. Cabot*, 18 Id. 553; *Dana v. Bank*, 10 Metc. 250; *Howell v. Saule*, 5 Mason, 410; *Barney v. Miller*, 18 Iowa, 466; *Jones v. Smith*, 73 N. Y. 205; *Gano v. Aldridge*, 27 Ind. 294; *McEowen v. Lewis*, 26 N. J. Law, 451. It is also well settled that, when reference is made to a map or plat in a deed, such map or plat is considered as incorporated in it as fully and completely as if it were actually delineated in the instrument. *Wilson v. Hoffman*, 70 Mich. 552; *Heffelman v. Water-Power Co.*, 78 Id. 121; *Jefferis v. Land Co.*, 134 U. S. 178; *Miller v. Land Co.*, 44 Kan. 354.

The defendant claims under a deed from Lucius Lyon to James M. Nelson, dated November 25, 1843, which describes the premises as follows:

"Beginning at a point in the west boundary of Mill street, where the division line between mill lots F and G intersects the same, according to the recorded plat of said village of Kent; thence southerly, along the west boundary of said street, 25 feet; thence westerly, on a line running parallel to the division line between said mill lots F and

G, 70 feet; thence northerly, on a line parallel to said street, 50 feet; thence easterly, on a line parallel to said division line between said lots F and G, 70 feet, to the west boundary of said street; and thence along said boundary to the place of beginning,—together with water to be taken from said canal *at the risk and expense of said party of the second part,* whenever the same may be had, sufficient to propel one run of millstones in an ordinary flouring mill."

The defendant gave in evidence a number of other conveyances covering a period from May, 1864, to January, 1888, through which it claims title. These deeds are not all of the same parcel, but are of "an undivided one-ninth part of lot F," "the north 25 feet of lot G," "nineteen feet of lot G," "the south 75 feet of lot G," "the north half of lot H," "the undivided half of 19 feet front on Mill street," "the south 56 feet of lot G," "an undivided half of the north 44 feet of lot H," etc. Every one of these deeds describes the land conveyed as part of lot F, G, or H, "according to the Kent plat, recorded," etc., and, almost without exception, metes and bounds are given, in which the parcel is described as "commencing on the west line [or boundary] of Mill street, * * * thence southerly on the west boundary [or line] of Mill street, * * * thence westerly," etc. Several of the parcels are referred to as fronting on Mill street. No one of these deeds contains any reference to the canal, except as each of them contains a separate, distinct, and specific grant of the right to draw sufficient water from the canal to propel one (or more) run of millstones. In three of these deeds the grant uses the following language:

"And also, as an easement appurtenant to said premises, * * * the right to draw sufficient water from the canal, at the risk and expense of said party of the second part, * * * to propel * * * run of millstones."

One of these deeds runs to the defendant.

Another grant, dated in 1865, uses the following language:

"Together with water to be taken from said canal at the risk and expense of said party of the second party, whenever the same may be had, sufficient to propel one run of millstones in an ordinary flouring mill; the said party of the second part being to his share of all expenses in keeping a full supply of water in said canal."

Another is as follows:

"Together with water to be taken from said canal, at the risk and expense of said party of the second part, whenever the same may be had, sufficient to propel one run of millstones in an ordinary flouring mill; the said party of the second part, his heirs or assigns, to bear and pay his or their equal share, in proportion to the water used by them and others, of all expenses of keeping and maintaining the dam and canal in repair, for the purpose of keeping up the supply of water used from such canal."

Another reads:

"Together with water to be taken from said canal, at the risk and expense of said party of the second part, whenever the same may be had, sufficient to propel one run of millstones in an ordinary flouring mill. This conveyance being made  *  *  *  upon the express condition that after a dam, pier, or wing wall shall have been completed at the head of said canal, sufficient to furnish a supply of water therein, the said party of the second part shall pay his or their several shares, in proportion to the water used by them and others, of all expenses of keeping said dam, wall, and canal in repair, for the purpose of keeping up the supply of water used in said canal."

The words, "at the risk and expense of said party of the second part," occur in other grants of this easement.

We have then:

1. The plat, in which the boundaries of each of these mill lots are clearly defined, which shows these lots from D to N, inclusive, as abutting upon a street 25 feet in width, between which street and the west line of the canal, and bordering the canal, is a strip 5 feet in width, which is in terms, expressed on the face of the plat, reserved. There is no ambiguity here. The intention of the proprietors is as clear as the same could well be made.

2. In the early conveyances, whereby the original parties parted with their interests, the water power, canal, basin, mill race, etc., are specifically and independently described.

3. Every conveyance made since 1835 expressly refers to this recorded plat, and, when general descriptive language is used, reference is expressly made to the plat for a more particular description.

4. In each of the conveyances, whether of a mill lot, or of an undivided interest in a mill lot, or of a part of a mill lot, a separate and specific grant is made of the right to use the water from the canal. If the grant of the mill lot carried a fee to the center of the canal, why should there be, in any case, a specific grant of the right to use the water? Or why should the expense be referred to in any case?

5. Defendant acquired its title to the mill lots at a date which is comparatively recent, and within the statute. No one of its grantors assumed to convey to it any interest in the reserved strip or in the canal, except the right to draw water therefrom, or any interest in Mill street, except what followed from a conveyance of the lot according to the plat, or by metes and bounds expressly designating the west line of Mill street as the eastern boundary.

It is clear, we think, that it was the intention of the original proprietors to reserve the title to the canal bed, the banks of the canal, the strips, the basin, and chutes as for their private property; that in the conveyances of the mill lots they conveyed the fee in the lots as platted only; and that the grant of the right to use the water from the canal was of an easement simply,—a right to the flow of water through flumes constructed for that purpose.

We cannot concur in the view taken by the supreme court of Wisconsin in *Smith v. Railway Co.*, 83 Wis. 271.[1]

---

[1] The opinion here referred to is that filed upon the original hearing, and first reported in 50 N. W. Rep. 497. Subsequently, upon rehearing, the court held that the claim of title to the roadway and raceway by virtue of the ownership of adjacent lots was rejected in *Smith v. Ford*, 48 Wis. 115, and was therefore *res judicata*, the parties to the case in question being privies in estate to the parties in the prior case. See 83 Wis. 279.

The appurtenance is, by the conveyance, specifically defined and measured. The grant of the right to construct a flume of dimensions sufficient for a specific purpose, and to a flow of water through the flume sufficient to operate one run of millstones, did not carry with it the fee in the land through which the flume was to be constructed, or in the canal, any more than would the grant of a right of way across an adjoining farm convey the fee in the adjoining farm and in the highway sought to be reached. Where the extent of the grant is specifically defined, it cannot be enlarged by implication. Both parties must be deemed to have contemplated such enjoyment of the water power as is in terms provided for.

In *Trustees v. Haven*, 11 Ill. 554, certain parties were owners of town lots, designated by numbers, on both sides of the Des Plaines river. On one side of the river they extended to the bank, but on the other side a street was laid out along the margin of the river, and between it and the lots. The proceeding was for an assessment of damages occasioned by diversion of the stream, and damages were awarded to those parties as riparian proprietors on both sides. The court held this erroneous. They were riparian proprietors on one side, and, as such, it was held, were owners to the thread of the stream; but on the other side their lots did not border on the stream at all, and consequently the common-law rule which gives the riparian proprietor the ownership in the bed of the river had, as to these lots, no application. This case is cited in *Watson v. Peters*, 26 Mich. 516, 517, the Court saying:

"This conclusion is supported by *Ryan v. Brown*, 18 Mich. 196, and to a certain extent by *Yates v. Milwaukee*, 10 Wall. 497, also. Of its correctness we have no question."

And, in speaking of the case which it was deciding, the Court said:

"If, on the face of the plat, by reference to which the defendant bought, there was anything which distinctly indicated an intent on the part of the proprietors to make this case exceptional, and to reserve to themselves any rights in front of the water lots marked on it, after they should have been sold, the case would be different."

In *Hall v. City of Ionia*, 38 Mich. 498, this Court said:

"There is no foundation for the claim that a right to the perpetual use of water must be dependent on a particular estate with which it is connected. * * * The value of water as a distinct inheritance, either for creating power or for other purposes of use or consumption, has been recognized in all periods, and its ownership is well established as not dependent on lands to which it may be appurtenant, but as having a separate and intrinsic importance. There may be an occasional *dictum*, and possibly some decisions, to the contrary; but most cases where any doubt seems raised on this question will be found to rest on peculiar facts which in no way involved the general doctrine. The facts are often such as to confine the use of water not only to special places, but also to specified purposes. But this limited use is the exception, and not the rule. *Hathaway v. Mitchell*, 34 Mich. 164. And for the general doctrine see, among many cases, *Hurd v. Curtis*, 7 Metc. 94; *Pettee v. Hawes*, 13 Pick. 323; *Cary v. Daniels*, 5 Metc. 236; *Borst v. Empie*, 5 N. Y. 33; *Goodrich v. Burbank*, 12 Allen, 459; *Owen v. Field*, 102 Mass. 90; *Emerson v. Mooney*, 50 N. H. 315."

Gould, Waters, §§ 304, 304*a*, says:

"Grants relating to water may include a certain quantity of the water itself, having reference to its bulk or weight, or to the quantity which will pass through an aperture of known dimensions in a certain time; or it may be of such water power as is necessary to propel certain machinery. In the latter case no property is acquired by virtue of the grant in the corpus of the water. Others are not deprived of the right to use it in such a manner as does not impair the power. Nor is it necessary that it should be annexed to a mill, or limited in location. Rights of water thus conveyed are distinct and substantive subjects of grant,

and, although in their nature appertaining to land, they may exist without any restriction as to their use in connection with the land granted, or any other designated parcel, and stand precisely as if granted by deeds containing no conveyance of land. If the right is granted in a single deed to build a dam on the grantor's land, to enter for repairs, and to flow the grantor's land to a specified point, the privilege of flowing may be exercised independently by a dam erected on land other than the grantor's. If land is granted with the right, should it become necessary, to erect a dam on the land of the grantor, in order that the grantee may have 'the best possible use of the water of a stream for running machinery,' the dam need not be maintained at the place where it is first erected, but the grantee is at liberty to erect and maintain the dam upon his own land. A conveyance of all the water of a river between certain points 'for the purposes and use of machinery or ditches, or for any other uses,' does not convey the land of a mill site on the stream.

"'A grant of a water-course in law,' says Jessel, M. R.,[1] 'especially when coupled with other words, may mean anyone of three things: It may mean the easement or the right to the running of water, it may mean the channel pipe or drain which contains the water, and it may mean the land over which the water flows. What it does mean must be shown by the context, and, if there is no context, I apprehend that it would not mean anything but the easement,—a right to the flow of the water.'"

It is insisted that the plat referred to was not signed or acknowledged by the owners of the land, so as to effect a statutory dedication, hence the title to the land remained in the proprietors; but this does not aid defendant. The proprietors have nowhere conveyed the fee to the defendant. The intention to dedicate Mill street as a public street is clear, and the acceptance by user, and by grading and improving the same, is equally clear. The street was graded in 1866, and an assessment was made by the city to defray the expense of such improvement, not only upon the owners of the strip east of Mill street, but also

---

[1] *Taylor v. St. Helens*, 6 Ch. Div. 264, 271.

upon defendant's grantors; and said assessment was paid by both parties.

It is next contended that the title to the canal is in the State. It will be observed that the original proprietors contemplated the use of the canal for water-power purposes only, and for that purpose it had been completed prior to the action hereinafter referred to. In 1847 the Legislature, by Act No. 19, which was entitled "An act to authorize the supervisors of the county of Kent to construct a canal and locks around the rapids of Grand river, at Grand Rapids," authorized said board to construct said canal, and appropriated 25,000 acres of land for that purpose. The act contemplated the construction of a canal with locks of sufficient capacity to receive boats, and pass them to slack water above the rapids at all stages of water; that the same should be completed within three years from the passage of the act; that when completed, and "the right of way secured to the people of the State of Michigan," certificates for the land appropriated should be issued. Section 9 provides that—

"Grants of the right of way, and a release of all damages to the State,   *   *   *   shall first be executed, *   *   *   and recorded,   *   *   *   so that the said right of way shall be secured to the State of Michigan free from all incumbrances whatever, leaving to the owners of the land on either side of said canal the use of the water therein for hydraulic purposes."

Section 11 provides that—

"The Legislature may at any time further provide for carrying out the true intent and meaning of this act, and for converting said canal into State property, whenever the public good may require, after 15 years from the passage of this act, the rights of individuals as then existing to be fully secured to them."

This act was amended in 1848, in 1849, and in 1851.

It appears by the proceedings of the board of supervis-

ors that in April, 1848, a contract was entered into with one Davis for the construction of said canal, and that certain work was done under said contract. It further appears that the prosecuting attorney of the county of Kent, in January, 1850, reported to the canal commissioners that he had examined certain " releases of the right of way and passage for a canal, locks, and dam around the rapids, which releases are generally on condition that the canal should be built on the bed of the old canal, and on the east side of Grand river;" and that he was of opinion that said releases were good and sufficient, and conveyed to the State a full and absolute right of way. The records of Kent county covering this period had been destroyed, and it appeared by the certificate of the Commissioner of the State Land Office that no grants or conveyances of the right of way for said canal were to be found in his office. The releases themselves were not produced, and the only evidence respecting them was what appeared in the report of the prosecuting attorney, and what is known as the " Scranton Abstract," which refers to these releases or grants as "right to enlarge canal," or "release for right of way for canal." The act of 1851 provided for the letting of a new contract after advertisement; for the taking down and reconstruction of the dam theretofore constructed; that the new contract should be made conditional upon the procurement of a perfect right of way for the canal; that the canal and locks should be completed before January 1, 1853; and further provided that—

" If, within one year from the passage of this act, the compensation to be made to the proprietors of the lands above the dam, ascertained as hereinbefore provided, shall not have been paid over, by the proprietors of the lands below the dam, to the said commissioner for the use of the proprietors first aforesaid, and their grants of the right of flowage fully perfected and delivered to said commissioner, and approved by the prosecuting attorney of

the county of Kent, or if, at the expiration of the said year, the contract for the completion of said canal and locks and the removal of said dam shall remain unlet, then it shall be the duty of the commissioner to cause the dam now appurtenant to said canal to be taken down and the obstructions by said dam interposed to the navigation of Grand river to be removed, to make sale of the materials of said dam, and to render an account of the expenses of such removal to the Governor of the State, and the excess of such expenses over the receipts from sales of the materials of said dam (if any) shall· be paid out of the unexpended balance of the original appropriation for the construction of said canal and locks."

Nothing whatever appears to have been done under this act. No contract was let, the dam was not constructed, nor was the old dam torn down or sold. The work had been about half completed under the first contract, but the most costly part of the work had not been done. The locks had not been constructed, nor had the improvements below the locks been made, nor had the canal been widened. The entire matter seems to have been abandoned by the State. In 1855 the Legislature appropriated the unexpended balance of the 25,000 acres of land to another purpose, repealed all acts or parts of acts inconsistent with the provisions of that act, and rescinded the joint resolution relative to the appropriation to build the canal around the rapids of Grand river. Whatever grants were made to the State were made in 1848. It nowhere appears that the State ever asked for the conveyance of the fee. It only asked for the easement,—the right of way and passage for the canal. It nowhere appears that these releases were unconditional. Indeed, the report of the prosecuting attorney of Kent county would indicate that conditions were attached. He says that the releases "are generally on condition that the canal should be built on the bed of the old canal, and on the east side of Grand river." The canal contemplated by the act was never built. It is true

it was commenced, but it was not completed, but was abandoned by the State. These were voluntary grants, made by the owners of the fee, who had conveyed water lots, and, in connection therewith, had made grants of the use of the water power, and were themselves interested, as owners of other water lots, in that use. The conveyances to the State are not before us. They appear to have been releases of a right of way only. The act itself provides for a reservation of the use of the water power, and it further appears that the releases were in other respects conditional. Section 8 of the act of 1851, above quoted, makes provision, in case of abandonment of the work, for the disposition of the dam, but contains no provision for the reconveyance, sale, or disposition of any fee acquired by the State. Even the expenses of removal were to be paid out of the appropriation. In the face of these facts it cannot be said that the releases conveyed the fee. This conclusion is further supported by the fact that for 40 years after the abandonment of the project by the State the bed of this canal has been treated by all the parties as private property, and neither county nor State has made any claim thereto, nor do they now assert such claim.

It is next insisted that plaintiffs are estopped from asserting title to the canal bed by an agreement entered into August 15, 1866, between a number of parties who were interested in the water power on the east side of the river, including Isaac H. Nichols, through whom plaintiffs derive their title, C. C. Comstock, R. E. Butterworth, M. L. Sweet, G. S. Deane, and Frederick B. Perkins, as parties of the first part, and one Powers, party of the second part, which recited:

"*That whereas*, said parties of the first part own and control the water-power interest of the canal on the east bank of Grand river, in said city, made by the water of said river, *in proportion to their respective rights to the*

*use of such water-power,* and said party of the second part owns and controls the water-power interest on the west bank of said river opposite said canal;

"*And whereas,* the said parties of the first part, in connection with said party of the second part, are about to improve the water power on each bank of said river by building a dam across said river from the west end of the guard gates across said canal, as well as otherwise improving said water power;

"*And whereas,* in the construction and maintenance of such dam it is important that said parties of the first and second part shall treat together and establish a plan of action, so that said contemplated improvements may be proceeded with in concert, and, when completed, in like manner may be cared for, preserved, and protected."

This agreement related to the water-power interest solely. The original idea was that the expense of the repairs to the canal was to be borne by those interested in the use of the water power. Several of the deeds expressly provide that the expense is to be so borne. The agreement expressly declares that the improvements, when made, shall inure to the benefit of the parties, as incidents and easements to their present right to water power, in proportion, not to the frontage upon the canal, but to the right to water power held by each; and provides that the expense of maintenance shall be borne by assessments, not upon said frontage, but upon such water power, equally. It further appears, however, that on August 13, 1866, Charles C. Comstock, R. E. Butterworth, Martin L. Sweet, Isaac H. Nichols, G. S. Deane, and Frederick B. Perkins, as parties of the first part, executed to the parties named as parties of the first part in the agreement aforesaid, the grantors excepted, a deed which recited that the parties of the second part, "in connection with the undersigned grantors, are about to improve the water power on Grand river, in the city of Grand Rapids, by building a dam across Grand river at or near the guard gates across the canal on the east side of Grand river, and otherwise

improve said water power;" and granted the right to enter upon the canal and banks, and do the very work contemplated by the aforesaid agreement; and provided that " said rights hereby granted and conveyed are to be held and owned by said parties of the second part hereto as tenants in common in proportion to their respective rights to the use of the water power along said canal on the east side of Grand river, said parties of the first part hereby saving and reserving to themselves, their and each of their heirs and assigns, forever, from the grants and rights hereby made, an interest equal in proportion, respectively, as the rights which the said parties of the first part each have to the use of the water power along said canal; said grants and reservations hereby made to be owned and used by the parties hereto as tenants in common in proportion to the right which each person has to use the water power along said canal, their heirs and assigns, forever." It will be borne in mind that the grantors in such deed were the same persons to whom Daniel Ball had, on February 29, 1864, conveyed the bed and banks of the canal, and strips of land on either side, to each an undivided part thereof. It is significant that the date of the conveyance from Ball to said parties of the first part is three times mentioned in the deed now under consideration. The right is granted to erect a dam at or near the guard gates, as such guard gates existed February 29, 1864, and to remove the west bank of the canal as it existed February 29, 1864. It will also be remembered that to each of the said grantors had also been conveyed a mill lot, with the right to use the water power, so that they were interested with the others in the water power. Both of these instruments were recorded, and through parties to these agreements defendant derives its title. These instruments, so far from operating as an

estoppel against plaintiffs, would seem to have an effect directly opposite.

Several other questions are raised upon instructions given to the jury, but, in the view which we take, it is unnecessary to discuss them.    Plaintiffs were entitled to a verdict.    Neither the defendant nor any one of its grantors has used or occupied the property in question for 15 years. All of the property immediately across the street from that sought to be recovered was conveyed by descriptions bounding it on the east by the west line of Mill street. It had been invariably conveyed by the same description, and in each conveyance a separate grant had been made of the right to connect with the canal, and use a prescribed quantity of water.    The plat to which these conveyances refer for description, and the conveyances through which defendant obtained its title, affirmatively show that, the title to the strip at the canal and to the canal bed was reserved, and did not pass by the conveyances of the land opposite the land in question.    Defendant and each of its grantors had ample notice thereof.    No one of defendant's predecessors has ever assumed to convey with the mill lots, or parts thereof, any land east of the west line of Mill street, or to transfer any possessory rights. It cannot be held that there is any such privity between these parties as to property on the other side of Mill street from that actually conveyed as enables defendant to tack, and thus make up the statutory period of adverse possession.    The land in controversy is a parcel distinct and separate from the parcel west of Mill street.    It is not, in any sense, within the same inclosure.    The parcels are separated by a public street.    While there is some testimony tending to show that lumber was at times piled along the east side of Mill street, it clearly appears that a passageway for the public was maintained between such lumber and the west line of that street, and no claim is

made of a right to exclude the public from that way. *Jenkins v. Trager*, 40 Fed. Rep. 726; *Erck v. Church*, 87 Tenn. 575; *Sheppard v. Wilmott*, 79 Wis. 15; *Dhein v. Beuscher*, 83 Id. 316; *Ablord v. Fitzgerald*, 58 N. W. Rep. 745. While it is unnecessary, in the present case, to go to the extent to which some of the cases go, the facts present a case where the principle of the cases cited should, we think, be applied.

The judgment is therefore affirmed.

LONG, GRANT, and HOOKER, JJ., concurred. MONTGOMERY, J., did not sit.