McMILLAN *v.* ETTER.

1. WATERS. AND WATERCOURSES — PRESCRIPTION — RIGHT TO SEVER FLOWAGE RIGHTS FROM LAND.

Where a mill owner and his predecessors in title acquired flowage rights by prescription and not as an original right naturally incident to and running with the land on which the mill was located, he had the right to sever ownership of such flowage rights from the land and sell either or both separately.[1]

2. SAME—PRESUMPTION THAT FLOWAGE RIGHTS WERE CONVEYED WITH LAND REFUTABLE.

Where the owner of land formerly used in connection with a mill, on which stood a store building, dwelling house, barn and chicken coop, and the old mill building, which had not been used for said purpose for several years, entered into a contract to sell said land, but did not include the flowage rights, any presumption that might arise that said rights were intended to be included is a refutable one, and is *held*, to be refuted by the weight of the evidence.[2]

3. SAME—NO PRESUMPTION THAT APPURTENANCE NOT VISIBLE PASSED WITH LAND.

Where the dam had been out for several years, and the waters above were back to their normal level, and there was no actual water power visible at the time of executing a contract for the sale of the land on which the old mill stood, there is no presumption that the flowage rights were included as an appurtenance, since only open, visible, actual and existing appurtenances at the time of the conveyance presumptively go with the land.[3]

Appeal from Cass; Des Voignes (L. Burget), J. Submitted April 24, 1924. (Docket No. 5.) Decided December 31, 1924.

Bill by William H. McMillan against DeVern Etter and another to enjoin the construction of a dam. De-

[1]Waters, 40 Cyc. p. 679 (1926 Anno); [2]Id., 40 Cyc. p. 679 (1926 Anno); [3]Id., 40 Cyc. p. 679 (1926 Anno); Deeds, 18 C. J. § 272.

On prescriptive right of third person benefited by overflow to insist on maintenance of dam, see note in 26 A. L. R. 804.

fendants filed a cross-bill for the specific performance of a land contract.    From a decree for plaintiff, defendants appeal.    Affirmed.

· *Thomas J. Cavanaugh,* for plaintiff.

*Harry C. Howard,* for defendants.

STEERE, J.    This suit was commenced November 29, 1920, by plaintiff, McMillan, to enjoin defendants from rebuilding a dam or flume which had supplied water to a mill at a small hamlet called Nicholsville, in Volinia township, Cass county.    A temporary injunction was granted.    Defendants answered, asking affirmative relief by cross-bill to which McMillan answered at length.    During hearing of the case it was admitted the import of the relief asked by defendants' cross-bill was for specific performance of a land contract from McMillan to defendant Etter given the preceding March, duly witnessed and acknowledged, reading as follows:

"It is hereby agreed by and between William H. McMillan, of the township of Volinia, Cass county, Michigan, and DeVern Etter of the same place as follows:    First party sells to the second party all of his real estate at what is known as Nicholsville, Cass county, Michigan, to second party for the consideration of eighteen hundred dollars, said real estate consisting of some five or six acres, which will be more particularly described at time deed is made.

"First party to furnish an abstract showing clear title.    Second party pays the sum of seven hundred cash on this day, and the balance of the said eighteen hundred dollars, to wit:    eleven hundred dollars is to be paid at time of delivery of abstract and warranty deed.

"In witness whereof the said parties have hereunto set their hands and seals, this 24th day of March, A. D. 1920.

"Wm. H. McMillan,
"DeVern Etter."

Antecedent to this suit the case of *Goodrich* v. *McMillan*, 217 Mich. 630, which related to this same right of flowage, arose between McMillan and the cottagers on Fish lake from which with connecting small lakes Dowagiac creek flowed and supplied the water for this mill.    That case was commenced in 1918.    It had been heard and decided in the lower court when the instant case was begun and was soon thereafter appealed to this court.    Though other parties and questions were there involved much of the testimony is of similar import and the following excerpt from the opinion in that case concisely gives a comprehensive view of the general situation:

"The grantor of defendant McMillan in the regular chain of title built a mill dam of earth and timber about the year 1850 in Dowagiac river.    It raised the level of several small lakes nearly 3 feet.    It flowed lands to the extent of 1,600 acres.    The flowage rights were acquired by prescription and have been conveyed with the mill property.    The forests disappeared.    The saw mill followed.    The grist mill was almost abandoned when, in 1917, the dam, aged and decayed, went out after having maintained the waters of the lakes above natural level for nearly 70 years.    Defendant McMillan decided not to rebuild the dam and made a tentative, if not an executed, agreement with certain owners of the flowed lands to surrender the flowage rights."

The owners of the flowed lands were allowed to intervene as defendants in that suit and filed an answer claiming amongst other things that they had contracted with McMillan to purchase from him whatever flowage rights he had or claimed.    Defendants were residents of Nicholsville when the dam went out and the mill was dismantled by McMillan.    Defendant Etter had lived in or near the village all his life and was a witness for the cottagers in that case.    He admitted that before he contracted with McMillan for

his property he knew its condition, with the flume gone and the mill dismantled.

After the instant suit came to issue and was heard in part the court continued it until an opinion should be handed down in the *Goodrich Case* when hearing was resumed, on October 12, 1922, and the case submitted.

The property owned by McMillan at Nicholsville consisted of 5 or 6 acres lying adjacent to and on the west side of Main street and Dowagiac creek flowed westerly through the north portion of it.   On the property were a store building, dwelling house, barn and chicken coop, and a mill building farther west and north, on Water street adjacent to the creek. Much of the northerly portion east of the mill was covered by a mill pond before 1917, which disappeared when the dam went out.

McMillan only testified at the first partial hearing, being incapacitated when the final hearing was had by a serious illness with which he died soon thereafter. His testimony taken early in the hearing described his property and the use he made of it, particularly the water power and mill, told of the flume and dam going out in March, 1917, and his abandonment of them thereafter, soon dismantling the mill and selling the mill machinery, shafting and other mill equipment to a party in Chicago and its removal, leaving nothing but the empty and abandoned building, started to tell of the litigation begun by the cottagers on the lake to compel him to restore the dam in which he and the owners of formerly flooded lands were associated as defendants, but was stopped by objection from answering a question as to his having arranged to sell them his rights of floodage.   It was later shown, however, that he early negotiated to sell the owners of the reclaimed land whatever water power rights he might have in that connection.   In June, 1917, he

gave them a 60-day option to purchase the same, signing the following receipt:

"June 21, 1917.

"Received of Arthur Wright $200 for 60 days' option on flowage rights east of section line running north and south between section line running north and south between sections 11 and 12, Volinia township.

"WILLIAM McMILLAN."

The $200 was paid McMillan by a check from White who was one of the association of owners of land reclaimed after the dam went out, who negotiated with McMillan for his right.    Most of the evidence relative to his selling his floodage rights to them is parol.    Much of the oral testimony on that subject was admitted against objection and error assigned on its admission.    It was shown that $50 more was paid McMillan on the purchase, or option, and testified by several witnesses that owing to the trouble over his rights between him and the cottagers, which resulted in the *Goodrich Case* wherein they were associated as defendants, he gave them an agreement to extend the time until that case was disposed of.    This was claimed to have been in writing and one of the contracting parties testified it was by a side memorandum on one of the papers signed by McMillan which passed between them; that it was given to him, but after diligent search, "looking through my papers that I had at home—everything I have there—I couldn't locate it anywhere."    He was not very clear as to its contents, but insisted that it said "the time would be extended indefinitely.    *    *    *    As I recalled this last paper on which that marginal note was written was on the printed stationery of Mr. McMillan."    It was shown that during the summer of 1917 McMillan stubbornly refused the importunities and demands of the cottagers that he rebuild the dam and restore the level of the lakes above, and said he had sold his rights to the farmers owning the previously flooded land;

that when the cottagers built a new dam above where his was he took help with him and tore it out, for which they had him arrested, their difficulties culminating in the *Goodrich Case* in which he and the intervening defendants were closely allied. On August 3, 1922, he and his wife executed and gave to those shore owners, 18 in number, with whom he had previously negotiated and been allied in the *Goodrich* litigation, a carefully drawn instrument with full recitals, conveying to them all and every right which he and his wife had acquired and then owned—

"to overflow any land whether owned by the second parties or others by reason of the maintenance of a dam at the point aforesaid and all and every right which they acquired and now have to raise the water by any means so that it will be maintained in the mill pond, Fish lake, or any of the lakes connected therewith at a point higher than its natural level when the country was in a state of nature.

"And the first parties hereby abandon forever all rights which they acquired to maintain a dam, overflow land, or to take water from the lakes above mentioned in sufficient quantities to run the grist mill, by means of a conveyance from Fanny N. Wright to William H. McMillan dated May 5, 1893," etc.

In the meantime defendant Etter had put of record his contract of March 24, 1920, under which he claimed ownership of the water-power rights in question as incident or appurtenant to the real estate then contracted for.

On October 3, 1922, McMillan left with a bank at Marcellus a properly executed deed conveying his real estate by correct descriptions to DeVern Etter with abstracts of title, to be delivered to him on payment of the balance due on said contract, but excepting and reserving from the conveyance in apt terms the flowage rights in question. When notified Etter repaired to the bank and examined the deed and ab-

stracts, refusing to accept the same because of the reservation.

The trial court held that plaintiff had not sold or contracted to sell his water-power rights to Etter and granted the permanent injunction asked, and on defendant's cross-bill found that he was entitled to the deed of the property McMillan tendered him on payment within 60 days of balance due on his contract with interest.   A decree was rendered and entered accordingly.   From such decree defendants appealed.

After the dam went out Etter rented the store building on the property and conducted a store there.   He knew when the mill was dismantled and of McMillan negotiating with the shore owners to sell them his flowage rights.   He also was familiar with the pending litigation when he contracted to buy this real estate.   He testified that when they were negotiating the deal McMillan told him the option he gave the farmers had expired and he wanted to sell out and go west to Montana.   When this testimony was given McMillan was on his death bed and died before the case was closed.   His daughter, Mrs. Scott, who lived on a ranch in Montana and returned on account of her father's illness, but did not arrive until his death, testified that she was back on a visit about 1919 and remained during that winter, leaving for Montana in May.   While there she heard Etter suggest to her father he would like to buy him out, saying he wanted to buy the store, house and what real estate there was around there.   Nothing was said about the farmers' option having expired or of her father going to Montana with her—"there was no talk along that line." She was present when Etter paid her father some money on the purchase and received a paper from him.   Etter then told her father he was going to tear down the mill to repair the store building.

While the witness was unable to produce the written agreement claimed to be lost the circumstances are

confirmatory of the fact.     The files and record of the
*Goodrich Case* were put in evidence.     In McMillan's
signed and sworn answer, filed subsequent to the time
the option would have expired, if not continued, he
states that after the dam owned and controlled by him
was destroyed he "entered into an agreement with
said farmers, to sell his flowage rights and thereby
permit said property owners to reclaim about two
thousand acres of land, as he had a right to do."   Later
in his answer he gave a list of some of those who,
"among others," owned land adjacent to his flowage
rights and then says that he entered into a—

"contract, arrangement and agreement with them to
sell and dispose of all of the land adjacent to their
respective properties that would be reclaimed by the
removal of the dam and the lowering of the water
to its natural level for an agreed consideration of
about two thousand dollars."

If it was in form of an option there is no evidence
aside from Etter's testimony that he ever thought of
or attempted to forfeit it, and there is abundance of
direct testimony, in addition to the confirmatory facts
and circumstances, that he never did.

Counsel on the respective sides argue the significance
of the instrument upon which defendant relies; for
defendant on the general proposition that:

"There is a presumption that a grantor intends to
convey all that he owns in any given estate."     8 R.
C. L. p. 1052.

"A contract to sell specific real estate carries with
it the appurtenances thereto in the absence of any-
thing in the contract showing a contrary intent."     39
Cyc. p. 1317.

"It is a general rule that upon the conveyance of
property the law implies a grant of all the incidents
rightfully belonging to it at the time of conveyance
and which are essential to the full and perfect en-
joyment of the property.   *   *   *   The appurte-

nances which pass are not limited to such as are absolutely necessary to the enjoyment of the property conveyed, but includes such as are necessary to the full enjoyment thereof.     However, to pass by implied grant the appurtenances must be open and visible. The grant of property will carry with it only actual, existing appurtenances, and will not create appurtenances." 18 C. J. p. 294; citing other authorities of like import.

While counsel for plaintiff contends that the presumption of intent is refutable and argues the evidence on the theory that:

"The construction of a grant of water power is so largely dependent upon the particular phraseology used and is so closely bound up with the contemporaneous facts and circumstances, that general rules of construction are of little utility.     There are, however, certain general rules of construction relating to such grants which make a part of the law when not controlled by the plain and unambiguous meaning of the language employed in the grant.     The intention of the parties is the determining factor and the practical construction given a grant by the parties thereto is a weighty factor in determining its meaning."     27 R. C. L. p. 1245.

That McMillan owned the right of flowage entitling him to raise the water in the lakes above to an artificial level is settled by the *Goodrich Case.*     It was not an original right naturally incident to and necessarily running with the land.     He and his predecessors had developed and acquired it by long user and peaceable possession during the statutory period of prescription.     His power to sever ownership of such flowage rights from the land, by selling one and keeping the other or separately selling both, cannot be questioned.     *Hall* v. *City of Ionia,* 38 Mich. 493; *Winchell* v. *Clark,* 68 Mich. 64.

When the "aged and decayed" dam and flume which were supplying the hydraulic power which served his "almost abandoned" grist mill went out, he decided

to entirely abandon it and not rebuild. He had acquired a valuable water privilege to maintain an artificial level on the lakes above which he had a right to sever from his land in the village where he did not want it, and sell to those upon the lakes who did. Its control was valuable to the shore-owning farmers, amongst whom he had lived for many years, to keep the lake surface down to its natural level; and also to the cottagers and anglers who wanted the artificial level maintained as before. In their sworn bill in the *Goodrich Case,* the latter allege that before they constructed the dam above, which he removed, they "sought to enter into negotiations with the said McMillan, thereby to a large extent reimburse the said defendant for reconstruction of his dam," but he "refused to negotiate with said plaintiffs." He, however, was willing to and did negotiate with the farmers and early sold them, tentatively at least, his flowage rights which enabled them to reclaim their previously flooded lands for an apparently modest price, considering the indicated benefits, variously stated at from $1,700 to $2,000, steadfastly standing his ground against the cottagers through a protracted litigation and thereafter deeding his flowage rights to the farmers.

The contract contains no mention of a mill or words suggesting a grant of water power rights. If any presumption that one was intended arises from the agreement to sell the real estate described, it was a refutable one. The actual intention of the parties when shown is recognized as the determining factor in such cases. That it was not McMillan's intention to grant any water power or flowage right is convincingly shown. The weight of evidence as to what Etter knew and said at the time the contract was made is convincing that he then did not intend to or think he was buying the water rights. Both subscribing witnesses to the contract testify that he said he was not buying that

privilege.    Mr. Huff, an attorney who drew up the contract and signed it as a witness, told of the parties coming to his office and having the contract drawn and said:

"Mr. Miller (the other witness) who was in the office, asked Mr. Etter whether he was buying the water rights or not; and Mr. Etter said he was not. Mr. McMillan said he was not selling the water rights."

Miller, who was called off the street by Etter to act as a witness, and told by him he was buying McMillan's real estate, testified:

"I says, 'Well, are you buying the water rights?' He says, 'No, I am not buying the water rights.    I am simply buying the building.'    He says, 'I figure on selling the old mill.'    *    *    *    He says, 'I don't need the mill building.'    And I asked him what he wanted for it; he said $300.    *    *    *    At the time Mr. Etter—or I signed the contract as a witness, it was read over in Huff's office.    I listened to it carefully when it was read.    *    *    *
"Q. You knew that the contract provided no reservations to Mr. McMillan for the water rights?
"A. Well, that is the reason I asked the question: I heard that read and it wasn't in there, so I asked the question 'Are you selling the water right?' and he (McMillan) said 'No, I am not; I have already sold the water rights.' "

The contract in general terms describes the property as all McMillan's real estate at Nicholsville "consisting of some 5 or 6 acres" to be more particularly described at the time a deed is given.    If such a writing be held by presumption to pass an implied grant of an appurtenance, the property sold carried with it only open and visible, actual and existing appurtenances "at the time of the conveyance."    At that time, and for years before, the dam and flume were gone, the pond had disappeared, the waters above were back to their normal level, the mill building on the premises

was dismantled and abandoned.    There was no actual water power then visible, existing and appurtenant to McMillan's real estate in Nicholsville as contracted for.

"If the right to use power from a dam has been acquired and affixed to a particular mill or parcel of real estate it will pass by a grant of the property of the grantor, with 'appurtenances.'    But if the power was not an appurtenance of the property at the time of the grant it will not pass as such, although the grantor had a right to make use of the power at the time of the grant."    3 Farnham on Waters and Water Rights, p. 2267, § 747.

For the foregoing reasons the decree will stand affirmed, with costs to appellee.

CLARK, C. J., and McDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.