# EVANS *v.* UNITED STATES.

POTOMAC RIVER; FISHERIES; BOUNDARIES OF THE DISTRICT OF COLUMBIA, MARYLAND, AND VIRGINIA.

1. The compact of 1785, between Maryland and Virginia, providing, among other things, that the right of fishing in the Potomac river should be common to and equally enjoyed by the citizens of both States, was never in force in the District of Columbia, in view of the acts of the two States, which ceded the territory now comprising the District of Columbia, and relinquished their joint interest in and control over that portion of the river within the bounds of the District of Columbia, to the Federal government; and subsequent to said acts of cession, Congress, in the exercise of its police power, has had the power to regulate fishing in that part of the river within the District.

2. Virginia, by her cession of a portion of her territory to the Federal Government for the seat of the general government, lost the ease-

Statement of the Case.

ments and privileges she possessed in that part of the Potomac river within the boundaries of the ceded territory under her compact with Maryland of 1785; and such rights and privileges were not revived by the act of Congress of July 9, 1846 (9 Stat. at L. 35, chap, 35), by which the Federal government receded to her the portion of her territory she had ceded to it, as that act was silent regarding such rights and privileges, and there can be no revival by implication.

3. The controversy between Maryland and Virginia relating to the boundary between those States, which resulted in the arbitration award which was approved by the act of Congress of March 3, 1879 (20 Stat. at L. 481, chap. 196), was limited to that part of the Potomac river extending between the two States, and not to that part of the river lying between the District of Columbia and Virginia; and by that act Congress did not accept the terms of the award, and grant to Virginia the same rights in the waters of the Potomac river within the District of Columbia that were granted to it in the waters outside of the District, or devest itself of jurisdiction over that portion of the river within the District, extending to high-water mark on the Virginia shore, the title to which was acquired by the United States under the cession from Maryland.

4. Citizens of Virginia possess no vested rights to fish in the Potomac river in the District of Columbia, that are not subject to its police regulations; and a citizen of that State who fishes in that river, opposite the District of Columbia, with a dip net, while standing on a rock above high-water mark on the Virginia shore may properly be convicted in the police court of the District of a violation of sec. 896, D. C. Code (31 Stat. at L. 1335, chap. 854), prohibiting any person to fish with such net in the waters of the Potomac river within the District of Columbia. (Mr. Chief Justice Shepard dissenting.)

No. 1799. Submitted January 9, 1908. Decided June 9, 1908.

IN ERROR to the Police Court of the District of Columbia.
*Judgment affirmed.*

The COURT in the opinion stated the facts as follows:

This case comes here on writ of error from a judgment of the police court of the District of Columbia. Plaintiff in error, Joseph Evans, was prosecuted in the police court upon an information wherein it was charged that the defendant, "on the 19th day of May, in the year of our Lord one thousand nine

hundred and seven, with force and arms, at the District afore-
said, and within the jurisdiction of this court, did then and
there unlawfully fish with a certain contrivance, commonly
known as and called a dip net, in the waters of the Potomac
river within the District of Columbia, against the form of the
statute in such case made and provided, and against the peace
and government of the United States of America." The statute
under which defendant was prosecuted is sec. 896 of the Code
[31 Stat. at L. 1335, chap. 854]. The portion which relates to
the present case provides as follows: "It shall not be lawful for
any person to fish with fyke net, pound net, stake net, weir,
float net, gill net, haul seine, dip net, or any other contrivance,
stationary or floating, in the waters of the Potomac river and
its tributaries within the District of Columbia."

The evidence discloses that the plaintiff in error, at the time
of the commission of the offense charged, was standing on a
rock on the Virginia shore, opposite to the District of Colum-
bia. The rock was above the high-water mark of the Potomac
river, and the plaintiff in error was fishing with his dip net in
the river, dipping the net into the water below high-water mark.
The plaintiff in error testified that, at the time of his arrest, he
was a citizen of the State of Virginia and a resident of Alexan-
dria county, and had been in the habit of fishing in the Potomac
river from the Virginia shore from time to time for several
years.

When the taking of testimony was concluded, plaintiff in er-
ror moved the court to discharge him upon the grounds which
have been made the basis of this writ of error. The court over-
ruled his motion, and found him guilty of a violation of the
above section of the statute; and from this judgment he comes
here upon writ of error.

*Mr. Douglas S. Mackall, Mr. R. Walton Moore,* and *Mr.
Crandal Mackey* for the plaintiff in error.

*Mr. Daniel W. Baker,* United States Attorney for the Dis-
trict of Columbia, and *Mr. Stuart McNamara* and *Mr. Ralph
Given,* Assistants, for the defendant in error.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

The assignments of error are as follows:

"1. The police court erred in refusing to rule upon the whole evidence that the defendant should be discharged and acquitted.

"2. In declining to rule, as matter of law, that the defendant had a right to fish from the Virginia shore in the Potomac river.

"3. In refusing to rule, as matter of law, that said sec. 896 of the Code had no application to the defendant.

"4. And in declining to rule that said sec. 896 was unconstitutional and void."

It seems essential to a clear determination of this inquiry to refer briefly to the respective rights of the States of Maryland and Virginia in the waters of the Potomac river. On June 20, 1632, Charles I. granted to Cecilius Calvert, second Baron of Baltimore and first Lord Proprietary of the Province of Maryland, all the territory in said Province. By the terms of the charter, the grant embraced the Potomac river, the islands therein, and the soil under it, to high-water mark on the southern or Virginia shore. On September 27, 1680, King James II. by royal patent granted to Lord Culpeper the territory lying south of the Potomac river, known as the Northern Neck of Virginia. In relation to these grants, it was said in the case of *Morris* v. *United States,* 174 U. S. 196, 43 L. ed. 946, 19 Sup. Ct. Rep. 649, "that the territory and title thus granted to Lord Baltimore, his heirs and assigns, were never devested by any valid proceedings prior to the Revolution; nor was such grant affected by the subsequent grant to Lord Culpeper. The record discloses no evidence that at any time any substantial claim was ever made by Lord Fairfax, heir at law of Lord Culpeper, or by his grantees, to property rights in the Potomac river or in the soil thereunder; nor does it appear that Virginia ever exercised the power to grant ownership in the islands or soil under the river to private persons. Her claims seem to have been that of political jurisdiction."

It has been conclusively adjudged that the charters granted

by the different monarchs of the Stuart dynasty, of territory in America, conveyed to the grantees both the territory described and the powers of government, including the navigable waters and the soil under them. These passed to the patentees in trust for the benefit of the communities to be established within the bounds of said grants. After the Revolution, the rights of the English Crown and Parliament became vested in the States, and the people themselves became sovereign. In them became vested, for their common use, the navigable waters and the soil thereunder, subject only to rights surrendered by the States to the general government. *Martin* v. *Waddell,* 16 Pet. 367, 10 L. ed. 997.

Owing to a controversy between Maryland and Virginia regarding the boundary as fixed by these two charters with respect to the Potomac river, a compact was entered into between the two States in 1785, which, among other things, provided:

"Seventh: The citizens of each State, respectively, shall have full property in the shores of the Potomac river, adjoining their lands, with all emoluments and advantages thereunto belonging, and the privilege òf making and carrying out wharves and other improvements, so as not to obstruct or injure the navigation of the river; but the right of fishing in the river shall be common to and equally enjoyed by the citizens of both States; provided, that such common right be not exercised by the citizens of the one State to the hindrance or disturbance of the fisheries on the shores of the other State; and that the citizens of neither State shall have a right to fish with nets or seines on the shores of the other.

"Eighth: All laws and regulations which may be necessary for the preservation of fish, etc., shall be made with the mutual consent and approbation of both States."

It will be observed that, by this compact, certain rights, among which was that of fishing in the Potomac river, were granted to the citizens of Virginia, but nowhere does it appear that Maryland, by its terms, express or implied, granted away any title to the river or the soil under it. The limitation contained in sec. 8 of the compact related only to legislation affect-

ing the specific privileges therein granted, and not to any property interest in the river. While the privilege of fishing secured to the citizens of Virginia may be regarded in a limited sense as an incorporeal property right, or a mere easement, it is one that could be devested at any time by the joint act of the sovereignties bound by the compact. In other words, the property right exists not in the river or in the soil under it, but in the privileges granted by the compact, so long as the States, the parties, continue the agreement in force. This applied equally, both to citizens of Virginia generally and to those owning lands adjacent to the Potomac river. This compact continued in force until the award of 1877, hereafter referred to, except as modified by provisions of the Constitution and the cession of the District of Columbia.

The District of Columbia was created originally from territory ceded by Maryland and Virginia. A brief inquiry into the legislation by which this was accomplished is deemed essential to a clear understanding of the question here involved. The Constitution, art. 1, sec. 8, clause 17, authorized Congress to acquire by cession of particular States, for the seat of government, a territory not exceeding 10 miles square. Both Maryland and Virginia were anxious to grant this territory. In November, 1788, the general assembly of Maryland passed an act which provided "that the representatives of this State in the House of Representatives of the Congress of the United States, appointed to assemble at New York on the 1st Wednesday of March next, be and they are hereby authorized and required on the behalf of this State to cede to the Congress of the United States any district in this State not exceeding 10 miles square, which the Congress may fix upon and accept for the seat of government of the United States." Acts of Assembly 1788, chap. 46, Kilty's Laws of Maryland. The following year Virginia passed an act entitled "An Act for the Cession of Ten Miles Square, or Any Lesser Quantity of Territory within the State to the United States in Congress Assembled for the Permanent Seat of the General Government." This act, as well as the Maryland act, provided that the cession should be in full and

absolute right and exclusive jurisdiction as well of the soil as of persons residing or to reside therein, providing, however, for the full protection of the property rights of individuals residing therein at the time of the cession. 13 Hening, chap. 32 .

Congress accepted these offers by an act approved July 16, 1790 (1 Stat. at L. 130, chap. 28), which authorized the President to select a site for the seat of government on the banks of the Potomac river. Pursuant to this authority, President Washington, on March 30, 1791, issued a proclamation describing the territory selected as follows: "Beginning at Jones Point, being the upper cape of Hunting creek, in Virginia, and at an angle in the outset of 45 degrees west of the north, and running in a direct line 10 miles for the first line; then beginning again at the same Jones Point and running another direct line 10 miles for the first line; then beginning again at the same Jones Point and running another direct line with a right angle to the first across the Potomac 10 miles for the second line; then from the terminations of the said first and second lines, running two other direct lines of 10 miles each, the one crossing the Eastern branch aforesaid and the other the Potomac, and meeting each other in a point." Further history of the acquisition of the District of Columbia by the United States is unnecessary. The territory thus acquired included parts of the States of Maryland and Virginia, lying, respectively, on the north and south banks of the Potomac river. Included within this area is the spot where plaintiff in error was fishing at the time of his arrest.

The compact of 1785 never was in force in the District of Columbia. It was not a consideration in the acts of cession, either as to soil or the protection of the vested rights of citizens within the district ceded. It was not essential that it should be, as the entire river within the District of Columbia was under the control of the general government. The citizens of the District of Columbia on both shores enjoyed equal rights with respect to it. By the respective acts of cession, Maryland and Virginia relinquished their joint interests in, and control over, that portion of the river within the bounds of the Dis-

trict of Columbia. It was within the power of the States, under
the compact, acting within the limitations of the Constitution,
to jointly abolish or change its terms at any time.. When they
ceded a portion of their territory, including a portion of the
river, to the United States, the legislative power that they pos-
sessed passed immediately to Congress; and Congress could do
anything, in the exercise of its police power in the regula-
tion of fishing in the Potomac river within the District, that
they could have done. Congress, possessing this power, could
legislate without respect to the terms of the compact, and
the compact could not be invoked against any such act of Con-
gress. In the case of *Georgetown* v. *Alexandria Canal Co.* 12
Pet. 96, 9 L. ed. 1014, the court said: "The compact made in
the year 1785, between Virginia and Maryland, was made by
the two States in their character as States. The citizens, in-
dividually, of both commonwealths, were subject to all the ob-
ligations imposed and entitled to all the benefits conferred by
that compact. But the citizens, as such, individually, were in
no just sense the parties to it; those parties were the two States,
of which they were citizens. The same power which established
it was competent either to annul or modify it. Virginia and
Maryland, then, if they had retained the portions of territory
respectively belonging to them on the right and left banks of the
Potomac, could have so far modified this compact as to have
agreed to change any or all of its stipulations. They could, by
their joint will, have made any improvement which they chose,
either by canals along the margin of the river, or by bridges or
aqueducts across it, or in any other manner whatsoever. When
they ceded to Congress the portions of their territory embracing
the Potomac river within their limits, whatsoever the legisla-
tures of Virginia and Maryland could have done by their joint
will, after that cession, could be done by Congress, subject only
to the limitations imposed by the acts of cession. We are satis-
fied, then, that the acts of Congress which granted the charter
to the Alexandria Canal Company is in no degree a violation of
the compact between the States of Virginia and Maryland, or
of any rights that the citizens of either or both States claimed

as being derived from it." If the compact, with respect to fishing, ever was accepted as a condition of cession, which is inconceivable, it has long since been repealed and rendered obsolete by the various acts of Congress relating to the regulation of fishing in the Potomac river within the District of Columbia, —notably, the act here under consideration.

But it is contended that, by the act of retrocession by which Virginia received back the territory she had ceded to the United States, she again acquired all the rights she possessed at the time of the cession, including her rights under the compact of 1785. This act, passed July 9, 1846 (9 Stat. at L. 35, chap. 35), provided, among other things, "that, with the assent of the people of the county and town of Alexandria, to be ascertained as hereinafter prescribed, all of that portion of the District of Columbia ceded to the United States by the State of Virginia, and all the rights and jurisdiction * * * over the same be, and the same are hereby, ceded and forever relinquished to the State of Virginia, in full and absolute right and jurisdiction as well of soil as of persons residing or to reside thereon." The United States was not a party to the compact of 1785, either originally or by subsequent acceptance of its terms. At the time of the retrocession, Maryland was not present at the point of controversy, and there was no one connected with the transaction upon whom Virginia would lay claim to a revival of the terms of the compact. At the time Virginia ceded her portion of the District of Columbia to the United States, she ceded certain described territory. It extended to the high-water mark on the south side of the Potomac river, which was the boundary line of Virginia, as fixed by the grant from the English Crown. The easements and privileges she possessed in the river, under the compact, were destroyed by the cession to the United States, and, having been lost, they could not be revived by the mere reconveyance of the territory ceded, unless expressly recreated in the act of retrocession. Regarding the easements and privileges granted in the compact, the act of retrocession is silent. There being no express revival, there could be no revival by implication. *Greenwood* v. *Metropolitan Elev. R. Co.* 26 Jones

& S. 482, 12 N. Y. Supp. 919; *Hennessey* v. *Murdock,* 43 N. Y.
S. R. 748, 17 N. Y. Supp. 276; Washb. Easements, 693.

In the year 1874, for the purpose of settling a controversy
in relation to the boundary between the States of Maryland and
Virginia, the legislatures of the two States agreed upon the sub-
mission of the matter to a board of arbitrators. In 1877 the
report of the arbitrators was accepted by both States, and in
1879 approved by Congress (20 Stat. at L. 481, chap. 196).
Congress, in approving the award, expressly provided: "Noth-
ing therein contained shall be construed to impair or in any
manner affect any right of jurisdiction of the United States in
and over the islands and waters which form the subject of the
said agreement or award." The section of the award pertinent
to this inquiry reads as follows: "Fourth: Virginia is entitled
not only to full dominion over the soil to low-water mark on
the south shore of the Potomac, but has a right to such use of
the river beyond the line of low-water mark as may be neces-
sary to the full enjoyment of her riparian ownership, without
impeding the navigation or otherwise interfering with the prop-
er use of it by Maryland, agreeably to the compact of 1785."
It is unnecessary for us to consider at length the terms of this
award, for it cannot in any way affect this inquiry.

It is insisted by counsel for plaintiff in error that Congress,
by the approval of this award, accepted its terms and granted
to Virginia the same rights in the waters of the Potomac river
within the District of Columbia that were granted to it in the
waters outside of said District. Long prior to this, Congress
had ceded back to Virginia the territory originally ceded by her
to the United States. The right of control over the Potomac
river within the District had been settled so far as Virginia
was concerned. The title of the United States, extending to the
high-water mark of the Potomac river on the Virginia shore,
had been vested in Lord Baltimore by the English Crown, and
had descended from him to the State of Maryland, and, from
the State, by act of cession to the United States. No jurisdic-
tion or control over the river thus acquired had ever been relin-
quished by Congress. The approval of the award by Congress

was necessary under the provision of the Constitution prohibiting one State from making a compact or agreement with another without the consent of Congress. It was only as a result of this necessity that Congress became connected with this dispute between the two States. By this approval, Congress had under consideration only the matters in controversy between Maryland and Virginia. That dispute was limited to that part of the Potomac river extending between the two States, and not to that portion of the river lying between the District of Columbia and Virginia. Maryland had no power to arbitrate regarding the river in the District of Columbia. She lost all control and property right in that portion of the river at the time of the cession of the District. Neither State, in its subsequent legislation relating to the award, assumed to regard it as including the river in the District of Columbia. Hence Congress, in approving the award, in no way committed the District to its terms or conditions.

We are of the opinion, therefore, that the territory now embraced within the District of Columbia is coextensive with that included in the cession from Maryland. Whatever title Maryland possessed in the soil became vested in the United States. Maryland at that time, as we have observed, unquestionably owned the soil to the high-water mark of the Potomac river on the southern or Virgina shore. Congress has never relinquished the title or control thus acquired. No such construction can be placed either upon the act of retrocession to Virginia, or upon the act of approval of the award between Maryland and Virginia in 1879. It follows that citizens of Virginia possess no vester rights to fish in the waters of the Potomac river in the District of Columbia, that are not subject to its police regulations. The act under which plaintiff in error was convicted is one that Congress had the power to enact in the exercise of the plenary power conferred upon it by the Constitution to legislate for the government of the District of Columbia. It applies to the Potomac river and its tributaries in the District of Columbia. It applies the same to a citizen of Virginia fishing in

the river from the southern bank as to a citizen of the District fishing from the northern shore.

The judgment of the police court is affirmed, with costs, and it is so ordered.                                    *Affirmed.*

Mr. Chief Justice SHEPARD delivered the following dissenting opinion:

My reasons for dissent in this case, briefly stated on account of the pressure of business at the close of the term, are these:

There is no doubt that the right of the State of Maryland in and to the Potomac River extended to high-water mark on the Virginia shore. By the terms of the seventh clause of the agreement of 1785, Maryland made two grants. The first gave to the citizens full property in the shore adjoining their lands, with all emoluments and advantages thereto belonging, and the privilege of making wharves and improvements. This grant is of the nature of an easement; but its effect is not involved. The second grant was a general right of fishing in the waters of the river, belonging to Maryland, not dependent upon or appurtenant to the ownership of lands on the adjacent shore. This does not create an easement, but a license of profit. Such a license is known to the common law as a *profit á prendre.* As said by Chancellor Walworth: "A *profit á prendre* in the land of another, when not granted in favor of some dominant tenement, cannot properly be said to be an easement, but an interest or estate in the land itself." *Post v. Pearsall,* 22 Wend. 425, 533. The right to hunt on lands, to fish in waters, or to use waters for various purposes is a *profit á prendre,* and while it may be annexed as an appurtenance to land by the terms of a particular grant, it may be, and usually is, granted in gross, in which case it becomes an interest in the land or water itself. *Wickham v. Hawker,* 7 Mees. & W. 63, 79; *Ewart v. Graham,* 7 H. L. Cas. 331, 345; *Webber v. Lee,* L. R. 9 Q. B. Div. 315, 318; *Pierce v. Keator,* 70 N. Y. 419, 421, 26 Am. Rep. 612; *Tinicum Fishing Co. v. Carter,* 61 Pa. 21, 39, 100 Am. Dec. 597; *Cobb v. Davenport,* 33 N. J. L. 223, 225, 97 Am. Dec.

718; *McCotter* v. *New Shoreham,* 21 R. I. 43, 47, 41 Atl. 572; *Goodrich* v. *Burbank,* 12 Allen, 459, 461, 90 Am. Dec. 161; *Hall* v. *Ionia,* 38 Mich. 493; *Columbia Water Power Co.* v. *Columbia Electric Street R. Light & P. Co.* 43 S. C. 154, 171, 20 S. E. 1002; *Columbia Water Power Co.* v. *Columbia Electric Street R. Light & P. Co.* 172 U. S. 475, 489, 43 L. ed. 521, 526, 19 Sup. Ct. Rep. 247.

In the light of these principles, I cannot agree in the conclusion, as stated in the opinion of the Court, that "nowhere does it appear that Maryland, by its terms, express or implied, granted away any title to the river."

When Maryland ceded her part of the territory comprising the District of Columbia, the United States took the same subject to this grant. The following year the State of Virginia ceded part of her territory. I do not doubt that Virginia could at any time regrant or extinguish the fishery right in the waters of the Potomac, which she acquired from Maryland. But this interest in the water so acquired was not appurtenant to the land ceded to the United States, and did not pass by the grant of sovereignty thereover. Nor do I find that the same passed by implication.

But assuming that it was included in the cession, I am of the opinion that it was embraced in the act of retrocession, which embraces "all of that portion of the District of Columbia ceded * * * by the State of Virginia, and all rights and jurisdiction therewith ceded over the same * * * and * * * hereby ceded and forever relinquished to the State of Virginia in full and absolute right and jurisdiction as well of soil as of persons residing or to reside thereon." Act approved July 9, 1846 (9 Stat. at L. 35, 36, chap. 35). The United States concluding, as the preamble to that act recites, that the ceded territory was unnecessary to any of their uses and purposes, undertook to, and in my opinion did, regrant to the State of Virginia everything that had been formerly ceded by her to them. The intention was to restore to Virginia in its entirety all that had been obtained from her by the cession, and to reestablish the statutes existing at and before that date. This

right to control the right of fishing is not inconsistent with the paramount right of the United States in navigable streams, so long as it may be exercised without obstructing navigation. *McCready* v. *Virginia,* 94 U. S. 391, 395, 24 L. ed. 248, 249.

I am of the opinion, therefore, that the judgment of the police court should be reversed, with direction to dismiss the complainant.